FILED
SUPERIOR COURT
OF GUAM

2014 NOV -7 PM 4: 10

CLERK OF COURT
BY: _____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| TUDOR CONSTRUCTION CO., INC., ) | |
| ) | |
| Plaintiff, ) | **CIVIL CASE NO. CV0513-12** |
| ) | |
| vs. ) | |
| ) | **FINDINGS OF FACT AND** |
| CORE TECH INTERNATIONAL ) | **CONCLUSIONS OF LAW** |
| CORPORATION and FIDELITY AND ) | |
| DEPOSIT COMPANY OF MARYLAND, ) | |
| ) | |
| Defendants. ) | |
| ) | |

### INTRODUCTION

This matter came before the Honorable James L. Canto II on Plaintiff Tudor Construction Co., Inc.'s complaint for breach of contract against Defendants Core Tech International Corporation and Fidelity and Deposit Company of Maryland, filed on May 3, 2012. A bench trial was held from September 22, 2014 through September 26, 2014. Attorney Thomas M. Tarpley appeared on behalf of Plaintiff, Attorney Anita P. Arriola represented Core Tech International Corporation, and Attorney David W. Dooley represented Defendant Fidelity and Deposit Company of Maryland. Having considered the parties' evidence, oral arguments, and the applicable law, the Court now issues the following findings of fact and conclusions of law pursuant to Guam R. Civ. P. 52 (a).

///

**ORIGINAL**

# BACKGROUND

On May 3, 2012, Plaintiff Tudor Construction Co., Inc. (hereinafter "Tudor") filed a complaint to allege nonpayment for work completed in two construction projects as a subcontractor to Defendant Core Tech International Corporation (hereinafter "CTI"), where one project was guaranteed by a payment bond executed with Defendant Fidelity and Deposit Company of Maryland (hereinafter "Fidelity"). Tudor alleges that CTI owes $103,525.15 plus interest for its work on the first project for the U.S. Navy (hereinafter "Navy Potable Water Project"). (Compl., 2, May 3, 2012). Tudor also alleges that CTI owes $232,502.49 plus interest for its work on the second project for the Guam Waterworks Authority (hereinafter "GWA Tank Project'). *Id.* at 2-3. The amount owed for work completed on the GWA Tank Project is fully insured by Fidelity's payment bond pursuant to 5 GCA § 5304. *Id.* In addition to the amounts owed under the two projects, Tudor seeks: (a) prejudgment interest on all sums the Court determines CTI wrongfully withheld and owes to Plaintiff; and (b) attorney's fees to the prevailing party pursuant to the contract between the parties. (Tudor's Trial Brief, 6, Sept. 15, 2014).

On November 7, 2012, Tudor moved to supplement its complaint with an additional claim that Fidelity has refused to pay undisputed debts in violation of a surety's good faith duty to process claims. Tudor's proposed supplemental complaint alleges that the parties agreed upon undisputed amounts of liability in August 2012 but that Fidelity withheld payment in bad faith, causing further damages related to creditor claims, and causing the emotional distress and hospitalization of Tudor's President. (Mot. to Add Supplemental Claims, 5-6, Nov. 7, 2012).

On January 23, 2013, CTI and Fidelity moved to amend their answers to allege a set-off defense and a breach of contract counterclaim for the GWA Tank Project. Tudor argued that paragraphs nine and ten of the counterclaim did not state plausible claims for relief and were therefore futile or alleged in bad faith. The proposed amended answers also denied the prior admission that $232,502.49 plus interest was owed to Tudor for the GWA Tank Project. Defendants asserted that the prior admission was made in error and Tudor objected that the correction was made in bad faith and with delay that shall cause prejudice.

On April 16, 2013, the Court issued a Decision & Order granting Tudor's motion to amend the complaint in part, but denied Tudor's motion to supplement a claim for emotional distress damages. (Dec. & Order, Apr. 16, 2013). The Court also granted CTI's motion to amend their answer. *Id.*

On January 29, 2014, the Court issued a Decision and Order recognizing a cause of action for bad faith claims against a surety. (Dec. & Order, 4-6, Jan. 29, 2014).

On September 22, 2014, a bench trial commenced on Tudor's complaint.

## FINDINGS OF FACT

In a bench trial, "the judge weighs the evidence, determines the credibility of the witnesses, and finds the facts." *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987). By a preponderance of the evidence, the Court makes the following findings of fact:

1. Philip Ahn (hereinafter "Ahn") is the President and founder of Tudor.

2. Myong Lee (hereinafter "Lee") is the owner of Iron Boy. He is a certified welder.

3. Thomas Camacho (hereinafter "Camacho") is the Vice President of Duenas Camacho & Associates (hereinafter "DCA"). He is a structural engineer involved in construction.

4. Won Joo Na (hereinafter "Na") is the head of the mechanical department at CTI. He is a mechanical engineer. Previously, he worked as a mechanical engineer for 20 years in Korea and worked on five to six tank projects. He was the Project Manager for the GWA Tank Project and he became involved with the project after CTI issued a stop work order to Tudor.

5. David Alan Barnhouse ("hereinafter "Barnhouse") is a certified weld inspector qualified to do visual inspections, and he is an API 653 tank inspector qualified to inspect above ground storage tanks. He is the owner of Island CERTS, a company that conducts safety training for heavy equipment and on-site inspections for structures. He conducted visual inspections of the tank shell welds for Astumbo-1 tank.

6. Dencio Mostoles (hereinafter "Mostoles") is a civil engineer working as a quality control manager at Overland Federal, a construction firm. He previously worked at CTI for 6 years as a project manager for the Navy Potable Water Project. As a project manager, he managed, monitored and controlled the scope of the project. Before working at CTI, he worked at Guam Construction Co. as a project engineer for 6 years on 2 projects at Leo Palace Hotel and Andersen Air Force Base, respectively.

**The GWA Tank Project**

7. The formal name of this project is "Phase 1 Inspection & Maintenance Repairs to Guam Waterworks Authority (GWA) Islandwide Steel Water Tank Reservoirs; Project No. IFB-02-ENG-2009."

8. In March 2010, the Guam Waterworks Authority (hereinafter "GWA") hired CTI as the prime contractor to inspect, maintain and repair thirty (30) steel water tank reservoirs located throughout Guam.

9. On April 9, 2010, Tudor and CTI entered into a construction subcontract for the Phase 1 Inspection and Maintenance Repairs to GWA Island-wide Steel Water Tank Reservoirs, Project No. IFB-02-ENG-2009. Under this contract, Tudor was to be paid $344,750.00 by CTI for its work.

10. Tudor hired Iron Boy and I-Construction as its subcontractors. Iron Boy was hired to conduct welding work on the tanks. I-Construction was hired to conduct painting, priming, and other miscellaneous work upon the tanks.

11. Na testified that the subcontract price of $344,750.00 included the work on three tanks and start-up and mobilization costs of thirty tanks.

12. Na testified that when a project has numerous phases, it is not a common practice to pay the start-up and mobilization costs in advance.

13. Iron Boy has yet to be paid in full for its work related to the GWA Tank Project. Iron Boy sought payment from CTI for the amount due from Tudor for its work on the GWA Tank Project.

14. The construction subcontract between Tudor and CTI for the GWA Tank Project includes a section designated as "General Terms and Conditions." Paragraph 5 of those General Terms and Conditions, entitled "Preliminary Investigation by the Subcontractor", provides: "Subcontractor certifies that it is fully familiar with the overall plans and specifications of the project, the location of the job site, and the conditions under which the work is to be performed, and it enters into this Subcontract based upon its own investigation and testing of the site, soil materials and compaction, and such other tests and matters, and Subcontractor is in no way relying upon any opinions or representations or other tests of the Prime which may have been provided to the Subcontractor."

15. Ahn testified that the project was initially to repair three tanks: Agana Heights, Piti, and Chaot.

16. Tudor cleaned the Agana Heights, Piti, and Chaot tanks, but after inspection, the repair work intended for the three tanks was cancelled.

17. GWA was to conduct an inspection of the work. Any work that had been done without GWA's approval and found to be incompliant with the technical specifications was subject to rework at Core Tech's expense. (CTI Exh. No. 18-2)

18. CTI sent Tudor a Notice of Default for Tudor's violation of the subcontract agreement. (CTI Exh. No. 20-1)

19. Change Order No. 1 was a deductive change that lowered the contract amount by $61,659.83. (Tudor Exh. No. 42).

20. Work on the Astumbo-1, Yigo-1, and Mangilao-2 tank was added to the project through Change Order No. 2. (Tudor Exh. No. 42).

21. Change Order No. 3 added additional work on the Yigo-1, Agat-2, and Nissan tanks as well as repair work on Yigo-1, Mangilao-2, and Astumbo-1 tanks. (Tudor Exh. No. 42).

22. The revised subcontract amount for this project was $680,694.91. This price reflects the increase in the projects as a result of Change Order No. 3. The subcontract amount was increased by $17,110.50 to account for Change Order No. 4.

23. Change Order No. 4 added Tudor's work on the Agat-2 tank. This Change Order and amount was approved by CTI.

24. CTI paid $187,998.35 to Tudor in relation to this project.

25. In total, Tudor performed work on seven tanks and did not conduct any work on the remaining 23 tanks.

26. In various court filings made at different times during the litigation, Tudor changed its claimed figure of "undisputed amounts".

*Start-Up and Mobilization Costs*

27. Ahn testified that the start-up and mobilization costs for work on 3 out of the 30 total tanks for the GWA project cost $95,000.00. (Tudor Exh. No. 31). Ahn testified that the costs for start-up and mobilization cost does not change with the number of tanks.

28. CTI paid Tudor $95,000.00 for start-up and mobilization costs.

29. Na testified that the start-up and mobilization cost of $95,000.00 was for all thirty tanks. (9/25, 1:54:10)

30. Na testified that, based on his experience repairing other tanks, the average start-up and mobilizations cost per tank should be approximately $3,000.00 per tank. Thus Na testified that Tudor's start-up and mobilization for the 7 tanks they worked on should be approximately $21,000.00.

31. Na testified that the start-up and mobilization costs include preliminary preparations, like training of workers, which cannot be calculated on a per tank basis.

32. CTI's Contractor Invoices Nos. 1-3 to GWA show that the start-up for the GWA Tank Project was 70% completed by June 1, 2010; 85% completed by July 1, 2010; and 100% completed by September 20, 2010. The same invoices also show that the mobilization was 50% completed by June 1, 2010; 85% completed by July 1, 2010;

and 100% completed by September 20, 2010. (Tudor Exh. No. 32). CTI invoiced GWA for $95,000.00 with an additional amount for its own "mark-up".

*Rework Costs*

33. For every tank that Tudor would perform work on, GWA provided Tudor beforehand with a notice to proceed with said work.

34. Tudor, through its subcontractors, performed defective work on the Astumbo-1, Yigo-1, and Mangilao-2 tanks.

35. CTI, as a result of Tudor's defective work, performed rework on the Astumbo-1 tank, Yigo-1 tank, and Mangilao-2 tanks.

36. I-Construction applied an unapproved coating to the Yigo-1 and Astumbo-1 tanks.

37. I-Construction applied an unapproved primer to the Yigo-1 tank.

38. Iron Boy started and performed work on the exterior ladder work on Yigo-1 without notification to GWA.

39. In September 2011, Barnhouse conducted a visual inspection of the welds on the Astumbo-1 tank. Upon inspection of the tank shell (the sides of the tank), he determined none of the welds on the Astumbo-1 tank shells were acceptable. None of the welds were marked or initialed by the welders who created them. Barnhouse did not conduct any inspection of the welds done on the roof portion of the Astumbo-1 tank.

40. CTI's rework on the welds on the Astumbo-1 tank passed Barnhouse's visual inspection.

41. Barnhouse also inspected the Yigo-1 and Mangilao-2 tanks after the inspection of the Astumbo-1 tank. There were minor deficiencies with the welds to those tanks that were corrected.

42. Chul Ho Kim (hereinafter "Kim") worked on the Astumbo-1 tank. His welding work on the tank shell was rejected by Core Tech as inadequate. (Tudor Exh. No.12. item 1).

43. Lee also performed welds upon the Astumbo-1 tank. Lee constructed, and/or attached by welding, the roof, vent, and hatch base of the Astumbo-1 tank. (Tudor Exh. No.12, item 1).

44. The welding work performed upon the Astumbo-1 tank was not initialed to demonstrate who generated what were disapproved welds. (CTI Exh. No. 25-1; CTI Exh. No. 29-1). It is customary in the welding industry for a welder to initial his or her own welds.

45. Kim was tested by Barnhouse for recertification as a welder. (CTI Exh. Nos. 26 and 27). Kim failed the recertification test conducted by Barnhouse. (CTI Exh. No. 29).

46. GWA required CTI to remove all welds that were generated by Kim on the Astumbo-1 tank and to replace them with welds created by a certified welder. This instruction applied to all welds necessary to the approved scope of work, including roof repairs, vent welding, and manhole access welding, as well as any unauthorized welding work. (CTI Exh. No.32-2).

47. GWA ordered CTI to conduct reworks on the following defective works: 1) unapproved exterior coating on ladder, roof vent, hatches, and platform of Yigo-1, Astumbo-1, and Mangilao-2 tanks; 2) unauthorized exterior ladder work on the Yigo-1 and Mangilao-2 tanks; 3) unauthorized and defective welding of the horizontal and vertical weld seams on the exterior and roof of Astumbo-1 tank. (CTI Exh. Nos. 18, 19, 21, 22, 23, 24, 25, 26, 27, 29, 21, 32, and 36).

48. CTI performed rework on rework item Nos. 1-13 on Tudor Exhibit No. 12 at the behest of GWA because GWA deemed those work items as being defective.

49. Ahn testified that Tudor recoated the tank center column on eight columns in three water tanks. The Yigo-1 tank was the only one not approved because the wrong primer was applied to the tank base. (Tudor Exh. No. 12, item 8).

50. Rework Item List No. 8 on Plaintiff's Exhibit No. 12 and CTI Exhibit No. 38-2 is the same description of work as the blasting and center work for the Yigo-1 tank listed on

CTI Exhibit No. 38-1. Na testified that these exhibits are all describing the same work which only occurred once.

51. Ahn testified that Core Tech withheld 34% of the pay application from Tudor because one column was not properly completed and rework upon it had to be done. The withheld amount equaled approximately $15,000.00.

52. Lee welded an additional horizontal flat bar to the tank exterior ladder of the Astumbo-1 tank.

53. Lee welded the tank vent & hatch base, platform, railing and exterior ladder to the Yigo-1 tank.

54. Lee welded the tank platform, railing and exterior ladder to the Mangilao-2 tank.

55. A stop work order was issued by CTI to Tudor on December 1, 2011 to prevent Tudor from performing any further work on the project. (CTI Exh. No. 26-1).

56. On January 18, 2012, Tudor was terminated from the GWA Tank Project by CTI for default. (Tudor Exh No. 23).

57. DCA was contracted by GWA to perform inspections upon their water tank systems. They were contracted to work in several phases. In the initial phase, they were to conduct visual inspection of the tanks. In the next phase, they were to conduct a deeper and internal investigation of the tanks, including API 653 Inspections which measures tank thickness, capacities, and life capacities among others. They subcontracted a Hawaii company to perform the API 653 Inspections.

58. Camacho testified that, based upon a visual inspection of the Astumbo-1 tank, all of the welds exhibited poor workmanship and did not meet acceptable welding quality standards. (CTI Exh. No. 29).

59. Na testified that CTI expended $90,568.41 for remedial and rework costs as a result of Tudor's unauthorized and poor work.

60. Na testified that CTI began the rework of Tudor's work in February 2012.

61. The rework was completed sometime during August or September 2012. The rework was performed by, or at the direction of, CTI was eventually approved by GWA.

*$25,000.00 Payment to I-Construction*

62. Tudor and CTI stipulated that Tudor would reimburse CTI in the amount of $46,517.05 for two subcontractor payments that were made to Frontier Supply Co. and Tridon.

63. On or about November 27, 2012, CTI agreed to pay I-Construction, a subcontractor to Tudor, $25,000.00 for work I-Construction claimed it performed upon the GWA project. (Tudor Exh. No. 11). CTI subsequently made this payment to I-Construction.

64. Ahn testified that Tudor only owes I-Construction $6,229.35 for work I-Construction performed on the GWA Tank Project. (Tudor Exh. No. 35).

65. I-Construction submitted an invoice of $45,991.00 to CTI for its work on the GWA project after it failed to secure payment from Tudor. (CTI Exh. No. 47).

**The Navy Potable Water Project**

66. The formal name of this project is "P-532 Potable Water System Recapitalization Phase I."

67. The United States Department of the Navy hired DCK Pacific LLC (hereinafter "DCK") as the prime contractor to upgrade existing water pipelines located on the U.S. Naval base at Sumay, Guam.

68. DCK hired CTI as a subcontractor for this project.

69. CTI hired Tudor as its own subcontractor for the same project. CTI and Tudor entered into a construction subcontract regarding this project on July 27, 2009.

70. The purpose of the project was to rehabilitate and upgrade the water system for the Navy, which entailed the installation of a 12-inch PVC pipeline on Harbor Road, located on the Naval base, replacing the existing 8-inch water lines.

71. Tudor claims it is owed money for services performed under three separate change orders: Change Order No. 1 involves installation of a fire hydrant; Change Order No. 2 involves the laying of pipeline; and Change Order No. 3 involves gate valve footing and thrust blocks installed at various points on the pipeline.

72. Tudor was paid the mobilization costs for this project in the beginning stages.

73. Paragraph 9 of the General Terms and Conditions of the construction subcontract between Tudor and CTI for the Navy Potable Water Project provides in part: "The Subcontractor hereby agrees to make any and all changes, furnish the materials and perform the work that the Prime may require, without nullifying this Subcontract, at a reasonable addition to, or reduction from, the Subcontract price hereinbefore named. Under no condition shall the Subcontractor make any changes either as additions or deductions without a written change order from the Prime. Prime shall not be obligated to pay any extra charges made by the Subcontractor that has not been agreed upon beforehand in writing by the Prime. However, since time is of the essence, if there is no agreement as to the price or cost of the change order, the Prime may instruct the Subcontractor in writing to proceed without prejudice to the Subcontractor's rights to arbitrate (or litigate at the Prime's option) the reasonable increase or deduction in the Subcontract price, and Subcontractor shall then proceed to do the rework as requested by the Prime."

74. Ahn testified that it is accepted practice in the construction industry to commence with the work without written approval if work conditions do not allow a subcontractor to obtain a written approval from the Prime beforehand. According to Ahn, if a subcontractor is ordered to do the work first, they comply and perform the work in the absence of a change order.

75. Mostoles testified that, in the event of a change in scope of work, the subcontractor is to request a change order and wait for the approval of said change order before proceeding with that work. Per Mostoles, if they do proceed with the work without prior approval, it is the subcontractor who is responsible for the cost of the work.

*Change Order No. 1*

76. Change Order No. 1 involved the installation of an additional connection to activate a fire hydrant.

77. DCK requested this installation, via email to CTI, and therein asked CTI for an estimate of the labor and equipment costs related to said installation. CTI forwarded this e-mail to CTI and requested CTI to submit a cost estimate.

78. Ahn testified that CTI instructed Tudor to proceed with the installation and that Tudor completed 77% of the work. Ahn testified that the new installation required disconnection from the old line and connection to the new line. At the time of the installation, the new line was not yet activated. The remaining 23% of the work consisted of disconnecting the old line, connecting the new line, and the backfill. As a result, Tudor sought from CTI a payment of $6,731.00. The total contract price for Change Order No. 1 was $8,668.00.

79. Mostoles testified that Tudor never asked for approval from CTI for Change Order No. 1.

80. Mostoles testified that neither CTI nor DCK gave Tudor written approval to proceed with the work for Change Order No.1.

81. Tudor proceeded with Change Order No. 1 before Ahn gave a cost estimate for the work. Tudor did not wait for an approved change order from DCK before proceeding with the work.

82. Ahn testified that DCK and CTI told them to proceed with the work before the issuance of an approved change order.

83. Tudor requested payment from CTI, but they were told that CTI was waiting approval from DCK.

84. Mostoles was present on-site while Tudor was conducting the work contemplated by Change Order No.1, but Mostoles did not stop Tudor from performing that work.

85. Ahn testified that Tudor's work encompassed by Change Order No. 1 was approved by DCK.

86. Mostoles testified that DCK did not approve or disapprove the work on Change Order No. 1.

\\\

*Change Order No. 2*

87. Change Order No. 2 involved complications that resulted from the fact that Harbor Road water line was connected to the existing water line underneath Marine Corps Drive. Ahn testified that Tudor was unable to install a waterline across, and perpendicular to, Marine Corps Drive as originally designed because of unforeseen subsurface conditions that were not indicated on the design drawings. The new lines had to be installed by going above or below the water lines underneath, and running parallel to, Marine Corps Drive.

88. Mostoles testified that this particular work could not be completed as originally planned.

89. Mostoles visited the work site everyday as Change Order No. 2 was being carried out. DCK was also present on-site.

90. Ahn testified that Tudor completed the work for Change Order No. 2 at the direction of DCK and CTI. Ahn testified that CTI representatives were present during the performance of this work and directed how the work was to be performed.

91. Ahn testified that the work would have been completed within two weeks if not for the subsurface obstructions. The obstructions caused the work not to be completed until six weeks' time. (Tudor Exh. No. 38).

92. Ahn testified that the additional cost for his work on Change Order No. 2 equaled $46,034.65. (Tudor Exh. No. 38).

93. Tudor was not provided with a written approved change order from DCK or CTI.

94. Mostoles testified that CTI never approved this change order and that DCK never gave approval for the change order.

*Change Order No. 3*

95. Change Order No. 3 involved the installation of thrust blocks and gate valve footings that were larger than what are considered the standard size in the industry.

96. The design for the entire Navy potable water project was finalized on March 9, 2009.

97. Mostoles testified that the final design was sent to Tudor before the submission of their bid for the Navy Potable Water Project.

98. Ahn testified that Tudor submitted an initial bid based on CTI's preliminary drawings which failed to show that larger specifications for the gate valve footings and thrust blocks would be necessary. Tudor's initial calculation of costs was based on standard sized thrust blocks and gate valve footings. Because Tudor had to install thrust blocks and gate valve footings larger than standard size, the cost of labor, materials and equipment all had to be increased by 10 to 20 times the originally anticipated costs.

99. Ahn testified that the standard size of a thrust block is 5' wide and 3' deep. The thrust blocks used for the project were 7' wide and 3.5' deep. (Tudor Exh. No. 38).

100. Ahn testified that Tudor asked CTI to increase the projected costs associated with the project or change the specifications of the gate valve footings and thrust blocks to a standard size. Ahn testified that the Project Manager and Vice President of CTI acknowledged this issue, but that CTI would still require approval from DCK.

101. Ahn testified that Tudor built the larger-than-standard sized thrust blocks and gate valve footings, but the additional cost incurred by Tudor on this project as a result of the larger specifications was $50,759.50. (Tudor Exh. No. 38).

102. Ahn testified that similar projects undertaken in the area employed standard specifications for those items. (Tudor Exh. No. 41).

103. Tudor was not provided with any written approved change order from DCK or CTI to increase the compensable cost for this aspect of the project.

104. Mostoles testified that CTI told Tudor at a meeting on August 25, 2010 that CTI was not going to approve this change order to increase payment to Tudor. (CTI Exh. No. 52-1).

105. Mostoles testified that Tudor proceeded with the work even though they were informed that CTI was not going to approve Change Order No. 3.

106. Mostoles testified that CTI never approved this change order and that DCK never issued a change order.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 7 GCA § 3105 (2013).

## I.  Breach of Contract

Under Guam law, a plaintiff must prove the following elements for a breach of contract claim: "(1) the contract; (2) plaintiff's performance of the contract, or excuse for nonperformance; (3) defendants' breach; and (4) the resulting damage to plaintiff." *Marianas Hospitality Corp. v. Premier Bus. Solutions, Inc.*, No. 07-00002, 2009 WL 750247, at *9 (D. Guam Jan. 14, 2009) (citation omitted).  Because two respective contracts for two separate construction projects were litigated in this case, the Court will discuss each project in turn.

### a.  GWA Tank Project

With respect to the GWA Tank Project, Tudor and CTI agree that: 1) the parties entered into a contract; 2) Tudor performed a portion of its obligations under the contract; 3) Tudor's work was fatally defective to an extent constituting material breach; and 4) CTI had to perform rework due to Tudor's defective work. *See Marianas Hospitality Corp.*, 2009 WL 750247, at *9.  Because it is undisputed that there was a breach of contract, the primary issue before the Court is the determination of the amount of damages, if any, a party is owed by the other in this case.

The parties are in agreement with the following respective figures: 1) the revised subcontract amount of $680,694.91, which incorporates the changes in the subcontract amount after Change Orders Nos. 1, 2, and 3;  2) the value of 51.9% completion of the revised subcontract in the amount of $353,280.65;  3) CTI owes Tudor $17,110.50 for Tudor's work on Change Order No. 4;  4) CTI paid Tudor $187,998.35 for Tudor's work on the GWA Tank Project;  5) Tudor owes CTI $46,517.05 for payments Tudor authorized CTI to make to Tudor's vendors, Frontier Supply Company and Tridon. (CTI Exh. No. 49-1).  The disputed amounts reflected in CTI's counterclaim are: i) the start-up and mobilization costs; ii) rework costs; and iii) CTI's $25,000.00 payment to I-Construction.

### i. The Start-up and Mobilization Costs

CTI paid Tudor $95,000.00 for project start-up and mobilization costs for the GWA Tank Project. CTI argues that the project start-up and mobilization costs were for thirty tanks and, because Tudor only worked on seven tanks and performed unauthorized work on three of them, CTI is entitled to reimbursement of $62,700.00. (CTI's Proposed Finds. Fact & Concl. L., 8-9, Oct. 3, 2014). Tudor argues that the project start-up and mobilization costs were for three tanks and amounted to $95,000. (Tudor's Proposed Finds. Fact & Concl. L., 5-6, Oct. 3, 2014).

Based on the evidence adduced at trial, the Court finds that the project start-up and mobilization costs incurred by Tudor in this case amounted to $95,000.00. The Court is not convinced that CTI proved by a preponderance of the evidence that CTI's $95,000.00 pre-payment of the start-up and mobilization cost was for thirty tanks. CTI's Contractor Invoices No. 1-3 to GWA demonstrate that the start-up and mobilization for the GWA Tank Project was 70% and 50% completed, respectively, by June 1, 2010; both 85% completed by July 1, 2010; and both 100% completed by September 20, 2010. (Tudor Exh. No. 32). Through these invoices, CTI is making an implicit declaration that the start-up and mobilization were completed after Tudor worked on the start-up and mobilization for these three tanks. Under these circumstances, the Court cannot fathom finding that Tudor incurred a lower cost and did not complete the full start-up and mobilization when CTI represented to GWA that 100% of the start-up and mobilization work was completed by September 20, 2010 and invoiced GWA for 100% of the cost, which was $95,000.00 with a mark-up.

For these reasons, CTI is not entitled to reimbursement of the project start-up and mobilization costs it paid to Tudor.

### ii. Rework Costs

CTI seeks payment in the amount of $90,568.41 for the costs it incurred to correct Tudor's defective work. This amount consists of rework cost of $75,934.00 incurred by April

30, 2012, Non-Destructive Testing Fee of $1,805.00, and coating work of $12,823.00. (CTI Exh. No. 38-1). The claimed rework cost of $75,934.00 consists of:

(1) Weld removal (by gouging) and re-welding on the tank shell and roof of the Astumbo-1 tank, and on the vent, and hatch base on the Astumbo-1 tank ($25,923.00);
(2) Repainting of welded repair on the tank shell and tank roof of the Astumbo-1 tank and on the vent, and hatch base on the Astumbo-1 tank ($7,003.00);
(3) Repair by welding additional horizontal flat bar on the tank exterior ladder on the Astumbo-1 tank ($4,494.00);
(4) Repair by welding additional horizontal flat bar on the tank exterior ladder on the Yigo-1 tank ($4,494.00);
(5) Repair by welding additional horizontal flat bar on the tank exterior ladder on the Mangilao-2 tank ($4,494.00);
(6) Repair by replacing the tank roof railing on the Yigo-1 tank ($4,494.00);
(7) Repair by replacing the tank roof railing on the Mangilao-2 tank ($4,494.00);
(8) Coating removal and repainting the tank center column of the Yigo-1 tank ($4,625.00);
(9) Repainting of tank platform, railing, and exterior ladder on the Yigo-1 tank ($4,625.00);
(10) Repainting of tank platform, railing, and exterior ladder on the Mangilao-2 tank ($4,625.00);
(11) Non-Destructive Testing for welded repair on the tank shell and roof of the Astumbo-1 tank, and on the vent and hatch base, platform, railing, and exterior ladder on the Astumbo-1 tank ($2,221.00);
(12) Non-Destructive Testing for welded repair on the tank vent and hatch base, platform, railing, and exterior ladder on the Yigo-1 tank ($2,221.00);
(13) Non-Destructive Testing for welded repair on the tank platform, railing, and exterior ladder on the Mangilao-2 tank ($2,221.00).

(CTI Exh. No. 38-2; Tudor Exh. No. 12).[1]

Tudor argues that CTI is entitled to only one-half of the costs listed in items Nos. 1 and 11 above because Lee performed half of the work for those two items and his welds were allegedly approved. (Tudor's Proposed Finds. Fact & Concl. L., 10-12, Oct. 3, 2014). Tudor further claims that rework was unnecessary for item Nos. 3, 12, and 13 above because the welds were performed by Lee and approved by GWA and CTI. *Id.* As for item Nos. 2, 4, 5, 6, 7, 9,

---

[1] The cost of the thirteen rework items is listed as $75, 940.41 in CTI Exhibit No. 38-1, but Tudor's Exhibit No. 12 lists the cost of the thirteen rework items as $75,934.00. Due to the minor difference between the two amounts, the lack of any arguments at trial as to the difference between these two amounts, and the breakdown of the costs as to each rework item in Tudor's Exhibit No. 12, the Court finds that the total cost of the thirteen rework items was $75,934.00.

and 10 above, Tudor argues that these were works that Tudor that never performed before its termination by CTI. *Id.* Thus, they argue that these works should not be considered rework for which CTI should be entitled to reimbursement. *Id.*

Based on the evidence adduced at trial, the Court finds that CTI is entitled to reimbursement for the rework cost of $75,934.00. Undisputed evidence was presented to show that Tudor hired Kim, and Kim performed unauthorized and sub-par work on the project. Kim's work could not be distinguished from Lee's work, regardless of whether Lee's work was actually approved. Furthermore, unauthorized and defective work was performed on the tanks prior to Tudor's termination, including but not limited to the following: unapproved exterior coating for ladder, roof vent, hatches, and platform of Yigo-1, Astumbo-1, and Mangilao-2 tanks; unauthorized exterior ladder work on Yigo-1 and Mangilao-2 tanks; and unauthorized and defective welding on the horizontal and vertical weld seams on the exterior of the Astumbo-1 tank. (CTI Exh. Nos. 18, 19, 21, 22, 23, 24, 25, 26, 27, 29, 21, 32, and 36). Additionally, the Court cannot find by a preponderance of evidence that Lee's work was certified by GWA and CTI. This is primarily because the only evidence presented alleging Lee's welds were approved was Ahn's and Lee's testimonies, and the Court finds Lee was evasive and otherwise not a credible witness. Contrary evidence showed that Lee's work was incapable of being distinguished from defective work due to lack of initials on his work, and subject to rework by order of GWA. Therefore, the Court finds that rework item Nos. 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, and 13 above are eligible rework items that Tudor must reimburse to CTI pursuant to their contractual agreement.

With respect to rework item No. 8 above, Tudor argues that, out of the eight interior columns of the three tanks it had to clean and coat, defective work was performed on only one of the columns of the Yigo-1 tank. (Tudor's Proposed Finds. Fact & Concl. L., 11, Oct. 3, 2014); (Tudor Exh. No. 2). Yet Tudor claims CTI only credited them for completing 66% of work instead of seven-eighths, or 87.5%, of the work. (Tudor's Proposed Finds. Fact & Concl. L., 11, Oct. 3, 2014). Furthermore, Tudor asserts that CTI overcharged because the rework was

completed for $4,625.00, and CTI is withholding $14,825.00 (approximately 34%) on the column work. (Tudor's Proposed Finds. Fact & Concl. L., 11, Oct. 3, 2014); (Tudor Ex. No. 2).

At trial, it was undisputed that Tudor satisfactorily completed work on seven of the eight interior columns of the three tanks and performed defective work on one of the Yigo-1 tank columns. The Court finds that Tudor should have been credited for at least 87.5% of this particular work, instead of 66%. As such, the Court shall deduct $10,995.29, calculated by subtracting 66% from 87.5% (21.5%) and multiplying it by $51,140.88, from the rework cost. Furthermore, the Court finds that CTI may be reimbursed for rework item No. 8.

Furthermore, CTI shall not be reimbursed for the Non-Destructive Testing fee of $1,805.00 on July 1, 2012 and coating work of $12,823.00 on October 1, 2012 as listed on CTI Exhibit No. 38-1 because CTI failed to adequately demonstrate at trial how these items were separate and distinct from the thirteen rework items detailed above, which already includes Non-Destructive Testing and coating work.

In conclusion, CTI is entitled to the rework costs for item Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13. This amounts to $75,934.00. Deducting $10,995.29 from this amount, the Court finds that Tudor shall pay CTI $64,938.71 as CTI's rework cost.

### iii. $25,000.00 Payment to I-Construction

I-Construction submitted an invoice to CTI seeking $45,991.00 for work performed on the GWA Tank Project that Tudor failed to pay. (CTI Exh. No. 47). CTI paid I-Construction an amount of $25,000.00 and seeks reimbursement of that amount from Tudor pursuant to section 15 of the General Terms and Conditions of the subcontract. (CTI's Proposed Finds. Fact & Concl. L., 8, Oct. 3, 2014). Tudor argues that it did not authorize CTI's payment of $25,000.00 to I-Construction and that I-Construction is only owed $6,229.35.00. (Tudor's Proposed Finds. Fact & Concl. L., 7-8, Oct. 3, 2014).

Section 15 of the General Terms and Conditions of the subcontract provides that CTI may pay for any labor and materials and deduct the costs thereof from any money then due or thereafter to become due to Tudor under the subcontract. (CTI Exh. No. 16). Adhering to the

contract term agreed by the parties, the Court shall award CTI for any labor materials that are due to Tudor from I-Construction. *Id.*

Based on the evidence adduced at trial, the Court finds that Tudor must pay CTI $6,229.35 for I-Construction's work on the GWA Tank Project. Although CTI presented evidence to show that I-Construction submitted an invoice of $45,991.00, this invoice lacks sufficient specificity, detail, and authenticity for the Court to believe that I-Construction furnished labor and materials worth that amount. This is so especially in light of Tudor's invoice and payment for I-Construction which tracks the labor and materials furnished by Tudor in much greater detail. (Tudor Exh. No. 35). Furthermore, CTI failed to sufficiently show why it paid only $25,000.00 of the $45,991.00 billed to them. CTI's payment of only $25,000.00 from a one-page invoice with minimal detail on the labor performed casts strong doubt upon any supporting justification for this $25,000.00 payment. Instead, the Court finds the $6,229.35 figure computed by Tudor to be the authentic amount owed to CTI.

For these reasons, Tudor shall pay CTI $6,229.35 for I-Construction's work on the project.

### iv. **Amount Due to CTI in Relation to the GWA Tank Project**

Based on the foregoing, the compilation of damages is as follows:

| | |
|---|---|
| 51.9% of the Revised Subcontract Amount | $353,280.65 |
| Change Order No. 4 | (+) $17,110.50 |
| Amount CTI Paid to Tudor | (-) $187,998.35 |
| Amount CTI paid to Frontier Supply Co. & Tridon | (-) $46,517.05 |
| Offset of Start-up and Mobilization costs paid to Tudor | $0.00 |
| Offset of CTI's Rework Cost | (-) $64,938.71 |
| Offset of CTI's Cognizable Payment to I-Construction | (-) $6,229.35 |
| **Total Owed to Tudor** | **$64,707.69** |

Therefore, CTI owes Tudor $64,707.69 in relation to the GWA Tank Project.

### b. Navy Potable Water Project

At issue in the Navy Potable Water Project is work for three change order requests that Tudor performed without written approval by CTI for those change orders. Tudor claims it should be compensated for the work performed, while CTI argues that it has no obligation to pay Tudor for the work because Tudor failed to obtain written approval from CTI to perform said work, as required by the subcontract for this project.

The subcontract between the parties in the Navy Potable Water Project provides, in relevant part, as follows:

> The Subcontractor hereby agrees to make any and all changes, furnish the materials and perform the work that the Prime may require, without nullifying this Subcontract, at a reasonable addition to, or reduction from, the Subcontract price hereinbefore named. Under no condition shall the Subcontractor make any changes either as additions or deductions without a written change order from the Prime. Prime shall not be obligated to pay any extra charges made by the Subcontractor that has not been agreed upon beforehand in writing by the Prime. However, since time is of the essence, if there is no agreement as to the price or cost of the change order, the Prime may instruct the Subcontractor in writing to proceed without prejudice to Subcontractor's rights to arbitrate (or litigate at the Prime's option) the reasonable increase or deduction in the Subcontract price, and Subcontractor shall then proceed to do the rework as requested by the Prime.

(Tudor Exh. No. 37,General Terms and Conditions, Section 9)

The Court finds that CTI did not provide Tudor with a written change order or a written document instructing Tudor to proceed with the three change orders. Therefore, the Court finds that Tudor breached the terms of the above section of the subcontract for starting and completing the three change orders. Although Tudor breached the terms of the contract, the Court acknowledges the fact that Tudor's work substantially benefited CTI.

It is a well-recognized principle that a trial court enjoys broad equitable powers. *Abalos v. Cyfred Ltd.*, 2006 Guam 7 ¶ 40. "[T]he powers of a court of equity are so broad as to adequately meet the exigencies of the case and render a decree which will justly determine the rights of the respective parties." *Id.* at ¶ 42 (citations omitted). In a breach of contract case, the Supreme Court of Guam has found that a party may obtain compensatory relief or restitutionary relief. *See Guam Resorts, Inc. v. G.C. Corp.*, 2013 Guam 18 ¶¶ 46-47. "The primary purpose

of restitution is to prevent unjust enrichment, and a party unjustly enriched is required to disgorge himself of the benefit of which it would be unjust for him to keep by returning it in kind or paying money." *Id.* at ¶ 47 (quoting *Guam Bar Ethics Comm. v. Maquera*, 2001 Guam 20 ¶ 25). In a contract case, a party in breach "is entitled to restitution for any benefit that he has conferred by way of part performance." *Id.* (citations omitted).

With respect to Change Order No. 1, it was undisputed that Tudor completed 77% of the work for Change Order No. 1 and it sought a payment of $6,731.00 from the total cost of Change Order No. 1, $8,668.00. (Tudor Exh. No. 38). The reasonableness of the cost associated with the project was also not disputed.

With respect to Change Order No. 2, it was undisputed that Tudor was unable to install a waterline across Marine Corps Drive as originally designed because of unforeseen subsurface conditions. Tudor worked around the obstructions and completed the work associated with this change order. Ahn testified that the additional work associated with this change order cost Tudor $46,034.65, calculated by taking two thirds of the total cost associated with the installation of the waterline ($60,045.20) and adding 15% mark-up for the overhead. This calculation of the cost was not disputed by CTI.

With respect to Change Order No. 3, evidence, including but not limited to testimony by Mostoles, was presented to show that a final design incorporating the larger specifications for the thrust blocks and gate valve footings were submitted to Tudor before Tudor submitted their bid for this particular project. Sufficient evidence was not presented to discredit this evidence, and accordingly, the Court finds that Tudor was on notice about the larger specifications for the project. Therefore, Tudor is not entitled to the costs it incurred from performing the work related to Change Order No. 3.

Having found that Tudor conferred a substantial benefit to CTI as to Change Orders Nos. 1 and 2, the Court finds that Tudor is entitled to restitution in the amount of $52,765.65, calculated by adding the cost of Change Order No. 1 ($6,731.00) and the cost of Change Order No. 2 ($46,034.65). The Court finds that this equitable relief is just, especially in light of the fact CTI representatives were on-site while Tudor performed the work contemplated by these

change orders and they did not stop or dissuade Tudor from performing the work. *Abalos*, 2006 Guam 7 ¶ 40.

## II.     Bad Faith Claim and Punitive Damages Claim

On January 29, 2013, the Court issued a Decision and Order recognizing a cause of action for bad faith claims against a surety. (Dec. & Order, 4-6, Jan. 29, 2013).

In the jurisdictions that recognize a cause of action for surety bad faith, courts have noted that "[s]o long as a surety acts reasonably in response to a claim made by its obligee, the surety does not risk bad faith tort liability." *Dodge v. Fidelity and Deposit Co. of Md.*, 778 P.2d 1240, 1243 (Ariz. 1989) (citation omitted). Conversely, "[w]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." *Wilson v. 21st Century Ins. Co.*, 171 P.3d 1082, 1087 (Cal. 2007).[2] To succeed on a claim for bad faith, "a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981).

Therefore, "before an insurer can be found to have acted tortiously (i.e., in bad faith), for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause*." *Chateau Chamberay Homeowners Assn. v. Associated Int'l Ins. Co.*, 108 Cal.Rptr.2d 776, 784 (Ct. App. 2001) (emphasis in original) (citations omitted). "[W]here there is a genuine issue as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." *Id.* (citations omitted).

At the close of Tudor's case, Fidelity moved to dismiss Tudor's bad faith claim and for dismissal of Tudor's claim for punitive damages. (Record Log at 2:13:45, Sept. 24, 2014). The Court granted Fidelity's motion on both counts. (Record Log at 3:34:03, Sept. 26, 2014).

---

[2] Under Guam law, suretyship is a type of insurance. 22 GCA § 18106 (2005).

The Court reasoned that Tudor failed to adequately demonstrate that Fidelity acted unreasonably or without proper cause when Fidelity denied Tudor payment under the bond. *Noble*, 624 P.2d at 868; *Chateau Chamberay,* 108 Cal.Rptr.2d at 784. The Court found that a genuine dispute existed as to Fidelity's liability under the bond when both Tudor and CTI claimed that they were owed compensation from the other. There was a reasonable basis on Fidelity's part not to pay on the surety bond because there was a *bona fide* dispute over liability between Tudor and CTI. Further, in various court filings, Tudor constantly changed its claimed figure for "undisputed amounts" which Tudor argued should have been paid by Fidelity at a minimum. Additionally, Tudor did not provide any authority for its implied argument that, although some partial amounts were undisputed, Tudor had an obligation to pay other partial amounts of the whole contract obligation which were not disputed. Even assuming this argument of piecemeal subrogation is correct, Tudor still failed to prove it held out an unwavering figure of "undisputed amounts" whereas every pleading Tudor filed on that issue expressed a different "undisputed amount" it believed Fidelity should have paid.

For these reasons, Tudor's bad faith claim and claim for punitive damages were denied.

## III. Prejudgment Interest

Under Guam law, 20 GCA § 2110 authorizes the award of prejudgment interest under specific circumstances:

> Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him, upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt.

20 GCA § 2110 (2013).[3]

In interpreting this provision, the Supreme Court of Guam has held as follows:

---

[3] "[T]he policy underlying authorization of an award of prejudgment interest is to compensate the injured party—to make that party whole for the accrual of wealth which could have been produced during the period of loss." *Guam Top Builders, Inc. v. Tanota Partners*, 2012 Guam 12 ¶ 64 (citations omitted).

> In interpreting 20 GCA § 2110, we follow the reasoning in *Duale* and hold that the test for recovery of prejudgment interest is whether the defendant actually knows the amount owed or from reasonably available information could the defendant have computed that amount. Thus, prejudgment interest is allowable where the amount due under the plaintiff's claim for damages is fixed by the terms of the contract or is readily ascertainable by reference to well-established market values. However, *where there is a dispute between the parties concerning the basis of computation of damages so that the amount of damages depends upon a judicial determination based on conflicting evidence*, prejudgment interest is *not* allowable.

*Guam Top Builders, Inc. v. Tanota Partners*, 2012 Guam 12 ¶ 68 (emphasis added).

In this case, Tudor's damages were neither certain nor capable of being made certain but rather it required a judicial determination of the actual amount due. *Id.* For this reason, Tudor shall not be awarded prejudgment interest.

## IV.   Attorney's Fees

The Supreme Court of Guam has recognized that "under the American Rule, attorney's fees are generally not recoverable unless authorized by statute, contract, or under equitable circumstances." *Duenas v. George & Matilda Kallingal, P.C.*, 2012 Guam 4 ¶ 48 (*quoting Fleming v. Quigley*, 2003 Guam 4 ¶ 20). In this case, the awarding of attorney's fees is governed by the subcontracts for the GWA Tank Project and the Navy Potable Water Project. Section 22 of the General Terms and Conditions for both contracts provide that:

> 22.0 Attorney's Fees
> If any party is in default, and the non-defaulting party requires the services of an attorney to enforce the terms of the Subcontract documents, then the non-defaulting party shall be entitled to receive from the defaulting party such reasonable attorney's fees and expenses incurred by the non-defaulting party.

(CTI Exh. No. 16); (Tudor Exh. No. 37).

Both parties claim that they are the prevailing party in this action and seek attorney's fees and costs associated with this action. However, upon review of the circumstances in this case where both parties were granted and denied various payments they each claimed, the Court finds that neither party is the prevailing party based on the damages sought for the claims made. Therefore, each party will bear its own attorney's fees and costs.

## CONCLUSION

In accordance with the findings of fact and conclusions of law set forth above, the Court orders as follows:

1. Plaintiff Tudor Construction Co., Inc. is hereby awarded judgment against Defendant Core Tech International Corporation in the amount of $64,707.69 in relation to the GWA Tank Project, plus interest thereon at a rate of 6% per annum from the date of the Judgment until paid in full.

2. Plaintiff Tudor Construction Co., Inc. is hereby awarded judgment against Defendant Core Tech International Corporation in the amount of $52,765.65 in relation to the Navy Potable Water Project, plus interest thereon at a rate of 6% per annum from the date of the Judgment until paid in full.

3. The Court finds in favor of Defendant Fidelity and Deposit Company of Maryland on Plaintiff's claim of bad faith and punitive damages.

4. Prejudgment interest shall not be awarded in this case.

5. Neither party is the prevailing party based on the damages sought for the claims made. Thus, each party will bear its own attorney's fees and costs.

6. Judgment shall enter accordingly.[4]

This matter is set for further proceedings on November 19, 2014 at 9:00 a.m. regarding submission of proposed judgments.

**SO ORDERED this** _7th_ **day of November, 2014.**

SERVICE VIA COURT BOX

I acknowledge that a copy of the
original hereto was placed in the
court box of:
ARRIOLA COWAN ARRIOLA
THOMAS TARPLEY, DOOLEY FOWLER
Date: _11-7-14_ Time: _1620_ ROGERS
_A. SANTOS_
Deputy Clerk, Superior Court of Guam

**HON. JAMES L. CANTO II**
**Judge, Superior Court of Guam**

---

[4] If any of the foregoing findings of fact constitute conclusions of law, they are adopted as such; and if any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.